## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JASON MALAKOSKI,

      Plaintiff,

      v.

MERRICK GARLAND, Attorney General, United States Department of Justice,

      Defendant.

CIVIL ACTION NO. 3:22-CV-00977

(SAPORITO, J.)

## **MEMORANDUM**

This civil action commenced on June 17, 2022, when the plaintiff, Jason Malakoski, filed the complaint in this matter against the defendant, the Attorney General of the United States, Merrick Garland ("Garland"). In his complaint, Malakoski claims that his employer, the Federal Bureau of Prisons ("BOP"),[1] retaliated against him and created a retaliatory hostile work environment because he filed an internal memorandum against his superior, requested accommodations for an

---

[1] While Merrick Garland, presumably in his official capacity, is the named defendant in this action as the cabinet official in charge of the United States Department of Justice, of which BOP is a component agency, this memorandum will largely refer to the actions of BOP and employees thereof.

injury, and filed two subsequent complaints with the Equal Employment Opportunity Commission, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and Section 501 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*

BOP has answered the complaint. (Doc. 7.) After the completion of discovery, BOP filed the instant motion for summary judgment. (Doc. 22.) The motion is fully briefed and ripe for decision.[2] (Doc. 22; Doc. 35; Doc. 39; Doc. 42; Doc. 43; Doc. 44). For the reasons that follow, the motion will be granted.

## I. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the

---

[2] On October 31, 2024, we ordered Garland to file a letter informing the court whether he sought supplemental briefing regarding Malakoski's RA retaliation claim, which was not briefed in his moving papers. (Doc. 40). Garland answered in the affirmative, and supplemental briefing was completed on December 20, 2024. (Doc. 41; Doc. 42; Doc. 43; Doc. 44).

outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a prima facie showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S.

at 331. Only once that prima facie showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## II.    MATERIAL FACTS[3]

Plaintiff Jason Malakoski began working for BOP in March 2009 as a correctional officer at United States Penitentiary Lewisburg ("USP Lewisburg"). He remained at USP Lewisburg until January 2015, when he transferred to Federal Correctional Institute Schuylkill ("FCI Schuylkill") as a lieutenant. During the period Malakoski worked at FCI Schuylkill relevant to this action, 2019 to 2021, the warden of the institution was Scott Finley ("Warden Finley").

### A. Retaliation Prior to First EEO Complaint

The genesis of this case is a memorandum Malakoski drafted to

---

[3] In compliance with Local Rule 56.1, the defendant's motion for summary judgment is "accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." (Doc. 32); M.D. Pa. L.R. 56.1. Moreover, each factual statement presented by the defendants in support of their motion for summary judgment "include[s] references to the parts of the record that support the statements." *Id.*; *see also* Fed. R. Civ. P. 56(c)(1).

A party opposing summary judgment is likewise required by the local rules to file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs" in the movant's statement of material facts, which must similarly "include references to the parts of the record that support the statements." M.D. Pa. L.R. 56.1.

Here, the non-moving plaintiff has filed the requisite responsive statement of material facts, responding to the numbered paragraphs of the moving defendant's statement of material facts. (Doc. 35-2.)

Warden Finley implicating Captain Michael Miller ("Capt. Miller") in misconduct.[4] According to Malakoski, on two occasions, at a work

---

[4] It is necessary for the purposes of this case to understand BOP's procedure for investigating and disciplining staff for misconduct. BOP staff members have an obligation to report staff misconduct, or the staff member themselves will be held accountable. When staff misconduct is reported to a BOP warden in written format, the warden will refer the allegations to BOP's Office of Internal Affairs ("OIA") in Washington, D.C. The referral is prepared by a BOP Special Investigative Supervisor ("SIS," typically, a lieutenant) who will write up the allegations and attach any supporting documentation to the OIA referral.

Upon receipt of the allegations, OIA decides, depending on the severity of the allegations, whether to forward them to the BOP Office of Inspector General, investigate the allegations itself, or return the case to the originating institution for investigation. In the event the case is sent back to the originating institution, the institution's SIS gathers the evidence, interviews witnesses, and interviews the subject of the investigation, typing up each response into an affidavit that the interviewee or subject has an opportunity to review for accuracy. The SIS's investigative report is then forwarded to OIA for review, which can approve the report or disapprove and send back to the SIS for correction. If the reported misconduct against a staff member is sustained, the "charge" of misconduct is sent to the originating institution's human resources manager, who handles the disciplinary process.

As warden of FCI Schuylkill, Warden Finley held SIS meetings every two weeks with the SIS Lieutenant, the human resources manager, an associate warden or wardens, an executive assistant, and captain. Warden Finley would ask the SIS Lieutenant the state of the investigations, including the number of interviews left to be completed in each matter, if the matter was completed, if the matter was sent to OIA, or if the matter was closed. This was the extent of Warden Finley's involvement in OIA investigations.

Malakoski denies BOP's assertions, calling the policies irrelevant and stating that he "has no facts to dispute the truth or authenticity of

*(continued on next page)*

- 6 -

Christmas party on December 1, 2018, and at Malakoski's home on April 14, 2019, Capt. Miller made inappropriate sexual remarks about Malakoski's wife. On May 6, 2019, Malakoski drafted a memorandum documenting these two incidents and gave it to Warden Finley. Warden Finley then asked an associate warden of FCI Schuylkill to complete a referral to OIA because the SIS Lieutenant, Derek Keeney ("Lt. Keeney") was absent that day. Malakoski alleges that because of this May 6, 2019, memorandum, he was repeatedly retaliated against and subjected to a hostile work environment.

Five days prior, May 1, 2019, memoranda authored by four BOP employees alleged misconduct by Malakoski, which Warden Finley similarly referred to OIA. The May 1, 2019, referral was designated OIA Case No. 2019-03867 and is still open.[5] On May 7, 2019, based on memoranda by two BOP employees, Warden Finley referred another allegation against Malakoski to OIA which was designated as OIA Case

---

the allegations made therein." Pursuant to Local Rule 56.1, Malakoski must respond to each of BOP's assertions and "include references to the parts of the record that support the statements." M.D. Pa. L.R. 56.1. Here, Malakoski has not done so, and we will deem the facts admitted.

[5] Because the matter is still open, BOP has not disclosed the allegations or the content of the investigation to either Malakoski or the court.

No. 2019-03903. OIA referred this case back to the institution for investigation by Lt. Keeney. OIA Case No. 2019-03903 concerned an allegation that Malakoski had a dispute with another lieutenant, Lieutenant Richard Cruz ("Lt. Cruz") concerning work schedules and that Malakoski made a vague threat. This investigation revealed sufficient evidence that Malakoski behaved in an unprofessional manner, and a charge of misconduct was sustained on March 16, 2021.[6] However, there was no decision letter until April 22, 2022, and Malakoski's sanction was a letter of reprimand issued by Warden Finley's successor.

On September 30, 2019, Malakoski called his supervisor, Captain Thomas Reisinger ("Capt. Reisinger") regarding a non-work injury, specifically, that Malakoski may have torn his MCL. Capt. Reisinger emailed Warden Finley and Associate Warden Kenneth Gabrielson ("Warden Gabrielson"), "Jay [Malakoski] just called me and he has a note to be off through the 2nd. Got an x-ray and MRI and his MCL may be torn off of the bone. May need surgery and rehab. He will keep me posted. This is all I know at this time." Malakoski provided a doctor's note dated

---

[6] In his response, Malakoski repeats the same objections to BOP's assertion.

September 30, 2019, excusing him from work from September 27, 2019, until October 2, 2019. On October 3, 2019, Capt. Reisinger again emailed Warden Finley and Warden Gabrielson, "Jay called me today at 11:00am, and notified me that he can not [*sic*] return to work until AFTER his MRI appointment on October 24, 2019. He sent me the doctor note also which states this."[7] A later doctor's note dated October 24, 2019, stated that Malakoski could return to work on October 28, 2019, without restrictions on his duties. Malakoski did not submit a written request for a light-duty assignment, and he testified that he did not believe himself to be disabled.[8]

On October 23, 2019, BOP informed Malakoski that he was not selected for a lateral lieutenant position at USP Lewisburg. Malakoski

---

[7] We note that the scanned doctor's note in the record is nearly unreadable, though the parties do not dispute its contents.

[8] In his response, Malakoski asserts that he contacted Capt. Reisinger about the possibility of returning to work with a light-duty restriction following his MCL injury. Malakoski was allegedly told that light-duty work was not available and that he would need to be available without restrictions to return to work. According to Malakoski, other staff members with non-work-related injuries were approved for light-duty assignments while he was denied. From our review of the record, Malakoski admits that he never requested light duty in writing, and Capt. Reisinger did not recall that Malakoski requested light duty either verbally or in writing when he informed him of his injury.

had lower rankings than the selectee. Capt. Reisinger and Warden Gabrielson served as references for Malakoski. According to Malakoski, his non-selection was due to the May 6, 2019, memorandum he submitted reporting Capt. Miller's misconduct.[9]

On October 30, 2019, Warden Finley received memoranda from two BOP employees regarding allegations of staff misconduct by Malakoski and Safety Manager Christopher Holdren ("Holdren"). Warden Finley had Lt. Keeney prepare a referral, which he submitted to OIA on November 1, 2019, and which OIA designated as OIA Case No. 2020-00851. The allegation was that while Holdren was walking out of FCI Schuylkill's administration building, Malakoski yelled, among other things, "You are a fucking rat; you're a fucking snitch and went to the Warden on me; and don't worry you got it coming."[10]

---

[9] In his response, Malakoski admits to each of BOP's assertions regarding his application and non-selection for the USP Lewisburg position.

[10] In his response, Malakoski admits to the memoranda and the referral to OIA but denies that he made the statements to Holdren, though the record supports that an altercation between the two men occurred on that date. For further context, Malakoski asserts that he received harassing text messages from an unknown phone number, later revealed to be Holdren, accusing him of improperly using sick leave in order to go hunting.

Concerned about possible workplace violence between Holdren and Malakoski, in conformance with BOP policy, Warden Finley convened a threat assessment committee to determine the level of threat posed by the employees in question.[11] The committee interviewed Holdren on November 1, 2019, but not Malakoski, as it was his day off. When he returned to work on November 2, 2019, Warden Finley temporarily reassigned Malakoski to the Communications Monitoring Room[12] in the administration building where his work hours and days off remained the same.[13] The reassignment was so that Malakoski and Holdren did not encounter each other while at work and so the threat assessment

---

[11] In his response, Malakoski asserts "the assignment of the purported incident to the threat assessment committee was convened in retaliation for Lt. Malakoski's complaint about Captain Miller." However, Malakoski also appears to acknowledge having a confrontation with Holdren on this date and does not genuinely dispute that BOP policy required convening a threat assessment committee under these circumstances.

[12] In its statement of material facts, BOP asserts that Warden Finley did not assign Malakoski to another lieutenant position because lieutenants bid for their shifts and posts, and he would not move another lieutenant off a post that he bid on and had seniority for to give Malakoski a post while he was subject to a threat assessment committee inquiry.

[13] In his response, Malakoski admits to BOP's assertion, but then asserts that his hours and pay were reduced because of the lack of overtime and elimination of a shift differential.

committee had adequate time to make its recommendation.[14]

Malakoski was on scheduled leave from November 3, 2019, to November 10, 2019. On November 12, 2019, Malakoski met with the threat assessment committee. Following this meeting, the next day, the committee determined that while Holdren and Malakoski both admitted that a vague threatening statement was made, there was no current risk of workplace violence. Warden Finley followed the committee's recommendations, returning Malakoski to his normal duties but also issuing him a memorandum reminding him of the need to maintain professional conduct. The investigation into OIA Case No. 2020-00851, however, revealed insufficient evidence to sustain the allegations against either Malakoski or Holdren. In total, Malakoski was temporarily reassigned to the Communications Monitoring Room for four days: November 2, 11, 12, and 13, 2019. While on temporary reassignment, he retained his position, grade, step, and salary.[15]

---

[14] In his response, Malakoski asserts that there is a genuine dispute of material fact regarding the reason for his reassignment because he argues the reason was retaliation while BOP argues that the reassignment was to give adequate time to the threat assessment committee.

[15] In his response, Malakoski admits this, but also asserts the

*(continued on next page)*

On November 10, 2019, while on temporary reassignment, Malakoski texted Capt. Reisinger asking to switch his days off, to take Wednesday off and work Thursday, due to childcare issues. Capt. Reisinger denied the request, because he wanted to be fair and consistent in enforcing his local policy of requiring lieutenants to find a relief for their shift, switch shifts with someone, or use leave.[16] Capt. Reisinger approved Malakoski's subsequent request to take eight hours of leave pursuant to the Federal Employee Family Friendly Leave Act.

## B. First EEO Complaint

On October 25, 2019, Malakoski contacted a BOP Equal Employment Opportunity Office ("EEO") counselor by phone. He had an initial interview with the counselor on November 12, 2019, again by telephone. He received a notice of right to file a formal complaint on November 22, 2019, and filed the formal complaint, assigned as BOP-2020-0127, with the EEO on November 23, 2019. The complaint listed

---

reassignment resulted in loss of hours and pay due to lack of overtime and the elimination of a shift differential.

[16] In his response, Malakoski asserts that this denial was in retaliation for the May 6, 2019, memorandum and that Capt. Reisinger consistently allowed other lieutenants to switch shifts. In its statement of facts, BOP asserts that using leave is the default choice because there is no mandate to change a pre-determined work schedule.

the above-referenced incidents. The EEO counselor interviewed Capt. Reisinger on November 21, 2019, but could not contact either Warden Finley or Warden Gabrielson.

On February 3, 2020, a unit manager at FCI Schuylkill made a call for medical assistance because an inmate, suspected to be under the influence of an unknown narcotic, became disruptive. Malakoski was the supervisory lieutenant on shift and arrived but did not restrain the inmate or keep constant visual supervision of the inmate. One of the responding paramedics approached the inmate from behind and applied restraints to the inmate's hands. Because there was an incident concerning the use of force, an after-action review of the incident was conducted with the medical department, the warden, associate wardens, and captain to determine if policy and procedures were followed.

Based on the after-action review and numerous memoranda by BOP staff, Warden Finley requested that Lt. Keeney prepare a referral for OIA. OIA assigned the incident OIA Case No. 2020-02512, and referred the case back to FCI Schuylkill for investigation.[17] The after-

---

[17] In his response, Malakoski admits that he did not restrain the inmate, but denies that he violated any BOP policy as alleged. He asserts

*(continued on next page)*

action review committee reported that supervising staff failed to follow policy as it pertains to the use of force and application of restraints. Warden Finley reassigned Malakoski to the Computer Lab on February 5, 2020, and Malakoski maintained his position, grade, step, and salary.[18] Malakoski subsequently amended his original EEO complaint to include his reassignment.

On March 17, 2020, Malakoski emailed Capt. Reisinger and Warden Gabrielson to express his interest in working as a reservation patrol officer, a position which monitors the institution roadways, outbuildings, and property boundaries to prevent the introduction of contraband into the institution and conducts identification checks of vehicles entering the institution. Warden Finley approved Malakoski's request, and he began working as a reservation patrol officer on March 31, 2020, working 10:00pm–6:00am (known as morning watch) and had

---

that he did not place the inmate in restraints because the inmate was going to the medical unit and was not combative in any way and hand restraints are only required in the Special Housing Unit. Malakoski asserts that when the inmate did become combative, he was not present for the incident because he was handling another inmate within the prison and that instead it was another lieutenant that was present.

[18] In his response, Malakoski asserts that he lost his overtime and shift differential while reassigned.

Sunday and Monday off.[19] The investigation into OIA Case No. 2020-02512 revealed insufficient evidence to sustain allegation allegations of misconduct against Malakoski, or the other officer identified during the investigation, Lieutenant Bardo.

Malakoski worked reservation patrol on morning watch until September 28, 2020. Malakoski requested to switch from morning watch to day watch, which is 8:00am to 4:00pm, and have Saturday and Sunday as his day off. Warden Finley approved this request.

## C. Second EEO Complaint

Malakoski worked reservation patrol on day watch until January 7, 2021, when he was advised that the institution needed to change him back to morning watch and switch his days off to Sunday and Monday.[20]

---

[19] In his response, Malakoski asserts that he "was asked to request an assignment to reservation patrol" and that Warden Finley assigned him to work 1:00pm-9:00pm, a shift that does not exist. After asking Capt. Reisinger why he was assigned a shift that no other employee at the institution worked, Capt. Reisinger allegedly told him "you will work whenever Warden Finley tells you to." In its statement of material facts, BOP asserts that on morning watch, Malakoski received 10% differential pay for any time worked between 6:00pm to 6:00am.

[20] In his response, Malakoski asserts that his shift assignments were changed so often that he could not even remember how many times he was changed. In its statement of material facts, BOP asserts that Malakoski's shift was changed due to institutional safety surrounding

*(continued on next page)*

Malakoski worked reservation patrol on morning watch until March 6, 2021.

Following Malakoski's shift change in January 2021, he met with an EEO counselor for an initial interview on February 8, 2021. The EEO Counselor advised Malakoski that he had fifteen days after receiving the notice of right to file a formal EEO complaint to file such complaint. Malakoski was issued a notice of right to sue on March 9, 2021. Malakoski, however, was on leave from March 9, 2021, to March 26, 2021, due to COVID-19. He returned to work on March 29, 2021. On April 15, 2021, he submitted his second EEO complaint by email, which was assigned BOP-2021-1024.

While Malakoski was on leave, Warden Finley rescinded his reassignment because he learned during the biweekly SIS meetings that OIA Case No. 2020-02512 for the February 3, 2020, incident was not going to be sustained.[21] Upon his return to work on March 29, 2021, until

---

COVID-19 and the introduction of contraband. Due to COVID-19, inmate social visiting was temporarily stopped at FCI Schuylkill.

[21] In his response, Malakoski again asserts that he was reassigned in retaliation for his May 6, 2019, memorandum and that he did not violate any BOP policy by failing to restrain the inmate on February 3, 2020.

May 12, 2021, Malakoski worked either as the SIS #2 lieutenant or the activities lieutenant. Further, while Malakoski was on leave, on March 19, 2021, Warden Finley requested that Lt. Keeney prepare an OIA referral for Malakoski because Malakoski allegedly called Captain Jennifer Cottrell ("Capt. Cottrell") a "dumbass" on the phone before hanging up on her. OIA designated the referral as OIA Case No. 2021-04128 and referred it back to the institution for investigation. Malakoski denied the allegation and was not reassigned during the investigation. The investigation into OIA Case No. 2021-04128 revealed insufficient evidence to sustain allegations of misconduct against Malakoski.

In another instance of alleged retaliation, based on three memoranda from BOP staff alleging misconduct by Malakoski on May 12, 2021, Warden Finley requested that Lt. Keeney draft a referral to OIA. OIA designated the referral as Case No. 2021-05618 and referred it back to the institution for investigation. This matter again involved an inmate and BOP staff with Malakoski as the supervising lieutenant. However, the matter remains open, and the contents of the matter were

not disclosed during this litigation.[22] Malakoski was again reassigned to reservation patrol effective May 13, 2021, working 2:00pm–10:00pm with Thursday and Friday off.[23] Malakoski subsequently amended his second EEO complaint to include the May 13, 2021, reassignment.

On June 3, 2021, Malakoski requested Capt. Cottrell change his shift on Saturday, June 5, 2021, from 2:00pm to 10:00pm to 6:00am to 2:00pm. Capt. Cottrell denied the request because there was no reservation patrol shift from 6:00am to 2:00pm on Saturdays and because Malakoski's reassignment letter stated he was to work the 2:00 to 10:00pm shift.[24] Further, there is no mandate to change a previously determined work schedule.[25] The acting human resources manager at FCI Schuylkill advised Malakoski that Capt. Cottrell had not permitted any lieutenant on a reassignment to change their shift. Following the

---

[22] In his response, Malakoski objects to the use of any facts related to OIA Case No. 2021-05618 because he was prevented from obtaining discovery on the matter during this litigation.

[23] In its statement of material facts, BOP asserts that Malakoski retained his position, grade, step, and salary, was entitled to 10% differential pay for anytime worked after 6:00pm and was entitled to an additional 25% increase in pay when working on a Sunday.

[24] In his response, Malakoski admits this.

[25] In his response, Malakoski denies this assertion as a conclusion of law.

denial of his request for a shift change, Malakoski again amended his second EEO complaint to include this incident as retaliation.

On August 5, 2021, a BOP staff member drafted a memorandum indicating they saw Malakoski holding a cell phone to his ear while on reserve patrol. BOP staff members are prohibited from carrying a personal cell phone while on duty. Warden Finley directed Lt. Keeney to draft an OIA referral. OIA designated the matter as OIA Case No. 2021-07714 and referred it to the institution for investigation. Warden Finley reassigned Malakoski to the Communications Monitoring Room effective August 9, 2021. There were no changes to his shift, work hours, or days off, or to his position, grade, step, or salary. Following this reassignment, Malakoski again amended his second EEO complaint. The investigation into OIA Case No. 2021-07714 revealed insufficient evidence to sustain the allegations of misconduct against Malakoski.

## III.    DISCUSSION

In his two-count complaint, Malakoski asserts two separate legal claims for retaliation and for retaliatory hostile work environment under both Title VII and the Rehabilitation Act.

## A. Title VII Claims

Malakoski first brings two claims pursuant to Title VII alleging retaliation and a retaliatory hostile work environment.

We analyze Malakoski's Title VII claims under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006) (retaliation); *Komis v. Sec'y of the U.S. Dep't of Labor*, 918 F.3d 289, 299 (3d Cir. 2019) (retaliatory hostile work environment). As summarized by the Supreme Court of the United States:

> Under *McDonnell Douglas*, a plaintiff must first establish a prima face case of discrimination. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its employment action. If the employer meets this burden, the presumption of intentional discrimination disappears, but the plaintiff can still prove disparate treatment by, for instance, offering evidence demonstrating that the employer's explanation is pretextual.

*Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003) (citations omitted).

First, Malakoski points to discrete instances of adverse employment actions taken towards him as retaliation for protected

activity,[26] including the (1) denial of light-duty status after he suffered a non-work injury; (2) his non-selection for a lieutenant position at USP Lewisburg; (3) his temporary reassignment to the Communications Monitoring Room after the altercation with Holdren in October 2019; (4) the denial by Capt. Reisinger of his request to switch his days off on November 10, 2019; (5) his February 5, 2020, reassignment while an OIA investigation was pending; (6) his shift change in January 2021; (7) his May 13, 2021, reassignment pending an OIA investigation; (8) the denial by Capt. Cottrell of his June 3, 2021, request for a shift change; and (9) his reassignment during a pending OIA investigation into allegations he used his cell phone on duty on August 3, 2021.

BOP argues that it is entitled to summary judgment for several reasons. First, it argues that Malakoski failed to establish a prima facie case of retaliation regarding the actions raised in his first EEO complaint, but even if he did, he has failed to rebut as pretextual any of BOP's legitimate, non-discriminatory reasons for its employment

---

[26] Both parties seem to agree that while Malakoski alleges retaliation beginning after he wrote a memorandum on May 6, 2019, he did not engage in protected activity until he contacted an EEO counselor on October 25, 2019. Indeed, it is not clear to the court that Malakoski's memorandum would be protected activity at all.

decisions. Second, BOP argues that Malakoski failed to timely file his second EEO complaint, thereby eliminating his retaliation claim for any such relevant employment actions and his retaliatory hostile work environment claim stemming from those adverse employment actions. Lastly, BOP argues that Malakoski has failed to meet the requirements of a retaliatory hostile work environment claim.

### 1. Title VII Administrative Exhaustion

As a threshold issue to the retaliation and retaliatory hostile work environment claim in his second EEO complaint, we must address whether Malakoski properly exhausted his administrative remedies.

Under Title VII, a plaintiff must exhaust administrative remedies prior to filing suit. *Robinson v. Dalton*, 107 F.3d 1018, 1020 (3d Cir. 1997). This includes the requirement that an employee file a formal EEO complaint within fifteen days of receiving a notice of right to file a complaint from an EEO counselor. 29 C.F.R. § 1614.105(d). Failure to comply with the fifteen-day deadline requires dismissal of the complaint. 29 C.F.R. § 1614.107(a)(2).

Here, it is undisputed that Malakoski contacted an EEO counselor and had an initial interview on February 8, 2021. He was informed that

he had fifteen days to file the formal complaint after receiving a notice of right to file a complaint. The EEO counselor issued that notice on March 9, 2021, but Malakoski was out on leave due to COVID-19 from March 9, 2021, until March 26, 2021. He received the notice when he returned to work on March 29, 2021. He did not file his formal EEO complaint until April 15, 2021, two days after the deadline expired.[27]

While acknowledging that he filed the formal complaint two days late, Malakoski argues that the untimely filing should be subject to equitable tolling, ostensibly because he and his family were sick with COVID-19 and he was on leave from March 9 until March 26, and did not return to work until March 29. While sensitive to Malakoski's argument, we decline to toll the fifteen-day deadline.

Regarding equitable tolling, the Third Circuit has:

> instructed that there are three principal, though not exclusive, situations in which equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights

---

[27] The parties agree that while the notice letter was issued to him on March 9, 2021, he did not receive it until he returned to work on March 29, 2021, at which point the fifteen-day period began to run.

mistakenly in the wrong forum.

*Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1387 (3d Cir. 1994).

Excusable neglect is not a sufficient justification for equitable tolling. *Pizio v. HTMT Glob. Sols.*, 555 Fed. App'x 169, 176 (3d Cir. 2014). Further, courts in this circuit have held that the mere existence of the COVID-19 pandemic is an insufficient justification for equitable tolling.[28] Here, nothing in the record indicates the BOP misled Malakoski as to the deadline to file the formal complaint, in fact, the record supports that Malakoski was aware of the deadline as he had already filed a separate EEO complaint in prior months. He did not mistakenly assert his rights in the wrong forum. Lastly, nothing in the record supports that an extraordinary obstacle stood in the way of asserting his rights in a timely

---

[28] *See Clemente v. Allstate Ins. Co.*, 647 F. Supp. 3d 356, 376 (W.D. Pa. 2022); *United States v. Henry*, No. 20-CV-01821, 2020 WL 7332657, at *8 (W.D. Pa. Dec. 14, 2020); *Brown v. Sugarhouse HSP Gaming, L.P.*, No. 21-CV-2426, 2023 U.S. Dist. LEXIS 176697, at *28 (E.D. Pa. Sept. 27, 2024) (refusing to equitably toll limitations period to file EEOC charge because the plaintiff did not explain how the COVID-19 pandemic prevented them from filing the charge earlier); *Trapp v. Oberlander*, No. 1:21-CV-1854, 2022 WL 36236, at *6 (M.D. Pa. Jan 4, 2022) (refusing to equitably toll limitations period for habeas petition because petitioner failed to offer any proof that he was diligently pursuing his rights despite the COVID-19 pandemic).

manner. Malakoski argues that he and his family were sick with COVID-19, but he waited seventeen days *after* returning to work from leave to file the complaint and provides no explanation as to why he could not have filed the formal complaint within the required time. Under these circumstances, we find no basis for equitable tolling of Malakoski's deadline to file his second formal EEO complaint.

Accordingly, we will grant summary judgment to the defendant on the plaintiff's Title VII retaliation and retaliatory hostile work environment claims arising out of his second EEO complaint[29] because, viewing the evidence of record in the light most favorable to the non-moving plaintiff, these claims are clearly barred as a matter of law for failure to timely exhaust administrative remedies.

### 2. *Title VII Retaliation*

To establish a prima face case of retaliation under Title VII, a plaintiff must establish that: "(1) she engaged in activity protected by

---

[29] To be clear, the alleged retaliatory conduct described in Malakoski's second EEO complaint includes: (1) the January 2021 shift change; (2) the May 13, 2021, reassignment related to an OIA investigation; (3) Capt. Cottrell's denial of his June 3, 2021, request for a shift change; and (4) his reassignment related to an OIA investigation into allegations he used his cell phone on duty on August 3, 2021.

Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore*, 461 F.3d at 340–41.

In a retaliation claim, the Supreme Court has defined an adverse employment action as something "materially adverse" to employment, meaning that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *Moore*, 461 F.3d at 341. The action, however, must have amounted to more than mere "petty slights, minor annoyances, and simple lack of good manners." *Burlington N.*, 548 U.S. at 68. As our sister court has explained, in *Burlington Northern*, "the Supreme Court provided examples of retaliatory actions that qualified as materially adverse, which included changes that had an 'enormous' impact on an employee's ability to work, exclusion from professional advancement opportunities, and re-assignment to less prestigious duties." *Goodman v. Norristown Area Sch. Dist.*, No. 20-CV-1682, 2021 WL 6063122, at *16 (E.D. Pa. Dec. 22, 2021) (citing *Burlington N.*, 548 U.S. at 69, 71)). On a motion for summary judgment, the scope of the

inquiry concerning the causal link between the protected activity and the materially adverse action is broad, and may consist of temporal proximity, "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232–33 (3d Cir. 2007). Further, the Supreme Court has held that Title VII retaliation cases "must be proved according to traditional principles of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *Carvahlho-Grevious v. Del. State Univ.*, 851 F.3d 249, 258–59 (3d Cir. 2017) (holding that, in a Title VII retaliation case, a plaintiff's causal burden at the prima facie stage of the *McDonnell Douglas* framework is less than at the pretext stage.)

BOP first argues that Malakoski cannot establish a prima facie case of retaliation because the instances of alleged retaliation were not serious enough to alter his "compensation, terms, conditions, or privileges of employment" and thus are not material adverse employment actions. Specifically, BOP argues that, in each instance, Malakoski kept his title, compensation, step, and grade. Malakoski counters that he lost the

opportunity for overtime and shift differentials. BOP further argues that, except for the February 2020 reassignment, there is no causal connection between his protected activity and the adverse employment action, and even for that reassignment, Malakoski has not rebutted its legitimate, nondiscriminatory reason for reassigning him.

Here, Malakoski has failed to establish a prima facie case of retaliation with respect to each incident of alleged retaliation described in his first EEO complaint.

First, regarding the denial of his request for light-duty status, Malakoski admits that he never asked for light-duty status in writing and the record reveals that he presented a doctor's note stating he was not cleared to return to work without restrictions until after an MRI appointment on October 28, 2019. While a genuine dispute of fact may exist regarding whether Malakoski indeed requested light-duty status, it is undisputed that he did not engage in protected activity until he spoke to an EEO counselor on October 25, 2019, and that the alleged denial of light-duty status took place weeks before, when he contacted Capt. Reisinger on September 30 or October 3, 2019. Therefore, Malakoski cannot show that the alleged denial of light-duty status constitutes

retaliation for protected activity that had not yet occurred. *See Waiters v. Aviles*, 418 Fed. App'x 68, 72 (3d Cir. 2011) (per curiam).

Second, regarding his non-selection for a lieutenant position at USP Lewisburg, Malakoski admitted that the selected candidates were more qualified than him. Further, Capt. Reisinger and Warden Gabrielson, both subordinates to Warden Finley, served as references for Malakoski. Moreover, Malakoski was informed of his non-selection on October 23, 2019, two days *before* he first engaged in protected activity, belying any assertion that the non-selection was in retaliation for that protected activity. *See Waiters*, 418 Fed. App'x at 72.

Third, regarding his temporary reassignment in November 2019 while a threat assessment committee investigated possible workplace violence, Malakoski has not presented evidence or cited case law supporting that a brief, temporary suspension—in this case four days— while an investigation is pending constitutes a materially adverse employment decision. Further, regarding causation, Malakoski first contacted an EEO counselor on October 25, 2019, but did not have an initial interview until November 12, 2019. He does not point to record evidence that any decisionmaker at BOP was aware of this initial contact,

citing instead to his own deposition testimony, in which he stated only that he believed he was retaliated against because of his May 6, 2019, memorandum reporting Capt. Miller, which is not protected activity. Even had a decisionmaker been aware of any protected activity, Malakoski does not genuinely dispute that he and Holdren had an altercation, that a vague threat was made, that a threat assessment committee was convened pursuant to BOP policy, and that one of the two individuals involved needed to be temporarily reassigned to prevent potential workplace violence, and in this case, it was he who made the remarks to Holdren.

Fourth, regarding Capt. Reisinger's denial of his request to switch days off, Malakoski again has not presented sufficient evidence that anyone was aware of his protected activity at the time, again belying any causal connection. Further, Capt. Reisinger had a local policy that, if a lieutenant did not have relief or could not switch with another lieutenant, he or she was required to use leave time instead, and Capt. Reisinger immediately approved leave for Malakoski upon request.

Finally, with respect to his February 2020 reassignment, Malakoski has failed to adduce sufficient evidence to demonstrate a

causal link between his protected activity—the filing of his first EEO complaint on November 23, 2019—and his February 5, 2020, reassignment, which occurred more than two months later. *See Shinn v. FedEx Freight, Inc.*, 783 Fed. App'x 229, 233–34 (3d Cir. 2019) (termination two months after participation in investigation was insufficient to suggest a causal relationship on its own); *Deans v. Kennedy House, Inc.*, 587 Fed. App'x 731, 735 (3d Cir. 2014) (per curiam) (holding that, in the absence of any other evidence suggesting a causal link, the temporal proximity between a plaintiff's termination and his filing of an EEOC charge more than two months earlier was "not so close as to be unduly suggestive" of a causal connection); *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759–60 (3d Cir. 2004) (explaining that a two-month gap is insufficient to support an inference of a causal connection between protected activity and termination); *Parish v. UPMC Univ. Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608, 636 (W.D. Pa. 2019) (finding employer's decision to terminate plaintiff slightly less than eight weeks after filing of amended EEOC charge was alone insufficient to constitute "unusually suggestive" temporal proximity); *Gillyard v. Geither*, 81 F. Supp. 3d 437, 444 (E.D. Pa. 2015) (finding temporal

proximity of plaintiff's non-selection for position two months after filing discrimination complaint was "not close enough to support, on its own, an inference of retaliation").

Accordingly, we will grant summary judgment to the defendant the plaintiff's Title VII retaliation claims arising out of his first EEO complaint because, viewing the evidence of record in the light most favorable to the non-moving plaintiff, Malakoski is unable to establish a prima facie case of Title VII retaliation, as a matter of law.[30]

### 3. Title VII Retaliatory Hostile Work Environment

To establish a prima facie case of retaliatory hostile work environment under Title VII, a plaintiff must establish that: "(1) [he] suffered intentional discrimination because of [his] protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) it would have detrimentally affected a

---

[30] To be clear, the alleged retaliatory conduct described in Malakoski's first EEO complaint includes: (1) the denial of light-duty work status after he suffered a non-work injury; (2) his non-selection for a lieutenant position at USP Lewisburg; (3) a temporary, four-day reassignment following an altercation between Malakoski and another BOP officer in October 2019; (4) Capt. Reisinger's denial of his November 10, 2019, request to switch his days off from work; and (5) his February 5, 2020, reassignment related to an OIA investigation.

reasonable person in like circumstances; and (5) a basis for employer liability is present." *Komis*, 918 F.3d at 293 (citations omitted). To determine whether an environment is hostile, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

This issue is not a close call. Having found that Malakoski is unable to establish a prima facie case of Title VII retaliation, he cannot establish the first element of a Title VII retaliatory hostile work environment claim—that he suffered intentional because of the same allegedly protected activity. Moreover, viewing the evidence of record in the light most favorable to the non-moving plaintiff, we find no reasonable jury could conclude that the alleged discrimination suffered by Malakoski was "severe or pervasive." *See, e.g.*, *Yarnall v. Phila. Sch. Dist.*, 57 F. Supp. 3d 410, 436 (E.D. Pa. 2014).

Accordingly, we will grant summary judgment to the defendant the plaintiff's Title VII retaliatory hostile work environment claims arising

out of his first EEO complaint because, viewing the evidence of record in the light most favorable to the non-moving plaintiff, Malakoski is unable to establish a prima facie case of a Title VII retaliatory hostile work environment, as a matter of law.[31]

## B. Rehabilitation Act Claims

Malakoski brings claims of retaliation and retaliatory hostile work environment under Section 501 of the Rehabilitation Act based on his request for light-duty status following a non-work injury.

Section 501(f) of the Rehabilitation Act, 29 U.S.C. § 791(f), requires a federal employer to comply with the standards set forth in Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 *et seq.*, and Sections 501 through 504 and 510 of the ADA, 42 U.S.C. §§ 12201–12204, 12210.[32] First, Section 102(a) of the ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability," 42 U.S.C. § 12112(a), a prohibition that includes failing to reasonably accommodate such individuals. *See Hohider v. United Parcel Serv., Inc.*,

---

[31] *See supra* note 30.

[32] The statute also includes a substantially identical provision imposing these same standards on employers who receive any federal funding. *See* Rehabilitation Act § 504(d), 29 U.S.C. § 794(d). The employer in this case, however, is a federal agency.

574 F.3d 169, 191 (3d Cir. 2009). Second, Section 503(a) of the ADA prohibits retaliatory discrimination, providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Third, the Third Circuit has also held that it is unlawful to retaliate against an employee for making a good faith request for an accommodation, even if that employee is not actually "disabled" under the ADA. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 191 (3d Cir. 2003). Appropriately, precedent interpreting the ADA is equally relevant to interpreting the Rehabilitation Act. *See, e.g.*, *Fowler v. UPMC Shadyside*, 578 F.3d 203, 208 (3d Cir. 2009) (characterizing the ADA and Rehabilitation Act standards as "coextensive"). Moreover, Rehabilitation Act retaliation claims are analyzed under the very same framework previously described for Title VII retaliation claims. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997); *see also McDonnell Douglas*, 411 U.S. at 802–06.

### 1. Rehabilitation Act Retaliation

To make out a prima facie case of retaliation under the Rehabilitation Act, Malakoski must show that (1) he engaged in protected activity; (2) he suffered a materially adverse action; and (3) there is a causal connection between the adverse action and the protected activity. *See Krouse*, 126 F.3d at 500–01. Here, the plaintiff points to his verbal request for light-duty status as a protected activity,[33] the denial of that request as a materially adverse action, and the temporal proximity of the denial, coming within a matter of days after the request was made, as sufficient evidence to give rise to an inference of retaliation.

A request for a reasonable accommodation may be verbal; it need not be in writing to be a protected activity for the purposes of a retaliation claim. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999); *see also Harris v. Proviso Area for Exceptional Children*, 581 F. Supp. 2d 942, 959 (N.D. Ill. 2008). But it must be made in good faith. The

---

[33] We note that the defendant has conceded in its briefs that Malakoski's first EEO complaint constitutes a protected activity, but as discussed above in the context of his Title VII claims, there simply can be no logical causal connection between this protected activity and a putative materially adverse action (denial of Malakoski's request for light-duty status) that occurred *before* the protected activity itself. *See Waiters*, 418 Fed. App'x at 72.

defendant argues that Malakoski's request for light-duty status was *not* made in good faith because his physician had never cleared him for light-duty work, but instead had prohibited him from any work at all until October 28, 2019, when Malakoski was permitted to return to work without any restrictions at all, which he did. We find it difficult to conclude, however, that no reasonable jury could find that Malakoski's request was nevertheless made in good faith. But the parties' dispute on the first element of a Rehabilitation Act retaliation claim need not be resolved on summary judgment, because the plaintiff's claim clearly fails on the second element as a matter of law.

The only materially adverse action identified by the plaintiff with respect to his Rehabilitation Act retaliation claim is the denial of his request to return to work with light-duty status. Even if the plaintiff's verbal request for light-duty status does constitute a protected activity under the Rehabilitation Act, "[t]he denial of a requested accommodation does not by itself constitute retaliation for the request—such reasoning would result in a claim for unlawful retaliation every time a request for accommodation, reasonable or not, is denied." *Feliciano v. Coca-Cola Refreshments USA, Inc.*, 281 F. Supp. 3d 585, 593 (E.D. Pa. 2017).

Accordingly, we will grant summary judgment to the defendant the on the plaintiff's Rehabilitation Act retaliation claim because, viewing the evidence of record in the light most favorable to the non-moving plaintiff, Malakoski is unable to establish a prima facie case of Rehabilitation Act retaliation, as a matter of law.

### 2. *Rehabilitation Act Retaliatory Hostile Work Environment*

As under Title VII, to establish a prima facie case of retaliatory hostile work environment under the Rehabilitation Act, a plaintiff must establish that: "(1) [he] suffered intentional discrimination because of [his] protected activity; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected [him]; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." *Komis*, 918 F.3d at 293 (citations omitted) (Title VII retaliatory hostile work environment claim); *see also Nazario v. Garland*, No. 3:22-CV-1366, 2024 WL 69153, at *7 (M.D. Pa. Jan. 5, 2024) (quoting *Komis*, 918 F.3d at 293) (Title VII and Rehabilitation Act retaliatory hostile work environment claims).

As with Malakoski's Title VII retaliatory hostile work environment claim, his parallel Rehabilitation Act claim fails. Malakoski uses the

same instances of retaliation as in his Title VII claims to support his Rehabilitation Act claims. There is nothing in the record to even suggest, however, that alleged retaliation against Malakoski was in response to potentially protected activity of requesting a reasonable accommodation for a temporary nonwork injury. Even in the context of his first EEO complaint, which referenced the denial of his request for light-duty status, we have already analyzed these incidents under Title VII, and found that Malakoski is unable to establish a prima facie case with his retaliatory hostile work environment claim. Our analysis of this substantially identical claim under the Rehabilitation Act leads us to the same conclusion, as Malakoski has produced even less evidence that his request for an accommodation (light-duty status) was the reason for any intentional discrimination or harassment.

Accordingly, we will grant summary judgment to the defendant the plaintiff's Rehabilitation Act retaliatory hostile work environment claims because, viewing the evidence of record in the light most favorable to the non-moving plaintiff, Malakoski is unable to establish a prima facie case of a Rehabilitation Act retaliatory hostile work environment, as a matter of law.

## IV.   CONCLUSION

For the foregoing reasons, BOP's motion for summary judgment will be granted in full and the clerk will be directed to enter judgment in favor of the defendant and against the plaintiff.

An appropriate order will follow.

Dated: February 20, 2025          **_s/Joseph F. Saporito, Jr._**
                                   JOSEPH F. SAPORITO, JR.
                                   United States District Judge